IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 14, 2007 Session

## STATE OF TENNESSEE v. LAVON NUNNERY

**Direct Appeal from the Circuit Court for Rutherford County**
**No. 57369      Jerry Scott, Senior Judge**

**No. M2006-02054-CCA-R3-CD - Filed October 11, 2007**

After a bench trial, the Rutherford County Circuit Court convicted the defendant, Lavon Nunnery, of misdemeanor assault for threatening to turn his pit bulldog loose on his neighbor. The trial court subsequently sentenced him to eleven months, twenty-nine days in the county workhouse, to be served consecutively to the three-year sentence for assault with a deadly weapon for which he was on probation at the time of the instant offense. In a timely appeal to this court, the defendant challenges the sufficiency of the convicting evidence, arguing that the proof was insufficient to show that the victim reasonably feared imminent bodily injury from the dog. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JERRY L. SMITH and JOHN EVERETT WILLIAMS, JJ., joined.

Tony L. Maples (on appeal) and James R. Smith (at trial), Murfreesboro, Tennessee, for the appellant, Lavon Nunnery.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; William C. Whitesell, Jr., District Attorney General; and Trevor H. Lynch and Thomas S. Santel, Jr., Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### FACTS

The State's first witness at the defendant's March 3, 2006, bench trial was the victim's wife, Kimberly Drummond, who testified as follows. She and her husband lived with their three children, ages 14, 8, and 6, at 103 Appomattox Court in Murfreesboro. The defendant, who had been their neighbor for approximately six or seven years, lived across the street from them. On the afternoon

of April 17, 2005, Mrs. Drummond was outside with a neighbor while her then-five-year-old daughter and two neighbor girls were riding their bicycles on their cul-de-sac. Her husband and son arrived home and came out to where the women and girls were congregated. At about the same time, the defendant pulled into his driveway, walked into his house, and returned with his pit bulldog.

The defendant walked to the end of his driveway with the dog and said, "Sic 'em, Dusty," causing the dog to strain and pull at the leash. The victim, who was standing in front of his own driveway, told the defendant, "Man, don't do this. There's [sic] kids out here." The defendant responded, "You don't know how bad I want to let this dog go on you." He then taunted the victim to step out in the street, telling him that he was going to "kick his ass" in front of all the children.

Mrs. Drummond testified that her family was terrified of the defendant's dog because they had seen it exhibit aggressive behavior in the past. As an example, she related that the dog had aggressively charged her family as they were walking home past the defendant's backyard approximately two years earlier. She said they had seen the defendant holding the dog in his backyard and had hurried past, but the dog had charged after them, coming within a couple of feet and stopping only when the victim struck it between the eyes with a full can of soda. On another occasion, she witnessed the dog chase a little girl who was riding her bicycle down their street.

On cross-examination, Mrs. Drummond testified that the defendant was at the end of his driveway, approximately ten to fifteen feet from the victim, when he said, "Sic 'em, Dusty." She acknowledged the street was between the men and that the defendant never released the dog from its leash. She could not recall if the victim backed up and said that he did not immediately go into the house because his children were still outside and he had to protect them. She acknowledged that her son had his dog, a basset hound, outside on a leash at the time. She said that the defendant, accompanied by his girlfriend's son, walked his dog down the street in front of her house while she and the victim took their children inside and called the police.

Mrs. Drummond testified there was no animosity between the families initially, but the defendant had been making progressively more violent threats toward them over the past few years. She denied that the victim had ever threatened the defendant. She acknowledged that she and her neighbors had held a cookout to celebrate the defendant's previous move from the neighborhood and explained that they had all felt safer when the defendant was gone. She readily admitted that she would like for the defendant to leave the neighborhood again.

Shannon Cucchiara, a neighbor of the victim and the defendant, testified that she was with her daughter in the victim's "front side yard" when the victim and his wife came home with their children and began talking to her. The defendant, who had been in his yard playing with his stepson, went into his house, returned with his dog, and walked to the middle of the street. After establishing eye contact with the victim, the defendant threatened to turn the dog loose:

> And when they came home and walked over to me, he went inside the house
> and got his dog, which I believe is a pit bull, and walked out into the middle of the

road and made eye contact with [the victim] and threatened to let the dog go. He threatened to sic the dog on the kids. I believe he said something to the effect of I have half a mind to let this dog go. And he reached down towards the dog's chain, and the dog had like an attack stance. And [the victim] said, Don't do it. And at that time I gathered my thoughts to get my children. [The victim's wife] tried to get her children. And then he said it again, and [the victim] just kind of shook his head and started walking away. And that's when [the defendant] started walking down the road.

Cucchiara testified that she knew that the defendant's dog was a mean dog because the defendant had "Beware of Dog" signs posted around his yard and house. She said that the dog barked and snarled at the fence whenever anyone walked past the defendant's yard and that she had seen it running loose in the past. On cross-examination, she testified that the defendant was within twenty-five feet of the victim when he made the comment about having half a mind to let the dog go. She said the victim stood where he was and told the defendant not to do it. The defendant then moved closer and made a gesture as if he were about to unleash the dog. At that point, the victim told him again not to do it. Cucchiara never heard the defendant say, "Sic 'em, Dusty."

Joann Goins, another neighbor of the defendant and the victim, testified that she was stopped in her vehicle on the street talking to the victim's wife when she saw the defendant come out of his house with his leashed dog, walk to the end of his driveway, and say something to the victim, who was walking his dog at the edge of his yard. She said that the men exchanged words and that she asked the victim's wife what was going on. In response, the victim's wife told her that she needed to get her children into the house. Goins described the incident:

As I said, when [the defendant] approached the road, he had said something. [The victim] had responded. [The defendant] had said something else. And at that point [the victim] kind of rolled his head and started to walk away into his yard. And at that point there when [the victim's wife] had said I just need to get my kids and kids were being scooped, and I had my daughter in the car as well, and we needed to go home.

Goins testified that she could not hear any of the words exchanged between the defendant and the victim. However, she could see that the defendant's dog was straining at the end of a taut leash: "There was no slack in the leash to where the dog was responsive to him to sit and so on and so forth. It was just pulled. It was ready to go." She said that she was familiar with the defendant's dog from occasions in the past when it had been loose and had charged her dog as she was walking down the street. On those occasions, she had had to pull her dog back and kick at the defendant's dog to prevent the dogs from fighting. On cross-examination, she acknowledged that the defendant never let his dog loose during the April 17, 2005, incident.

The victim testified as follows. He had just arrived home and was walking toward his wife and neighbors when the defendant came out of his house with his pit bull, walked to the end of his

driveway, and yelled, "Sic 'em, Dusty." He stopped and looked at the defendant and the dog, which was pulling at its leash and showing its teeth. The defendant kept coming toward him, yelling "Sic 'em, Dusty," and reaching down toward the dog's collar as if to turn it loose. He threw his hands up and told the defendant not to do it. The defendant replied, "You don't know how bad I want to let this dog go." He again told the defendant not to do it, and the defendant invited him into the street to fight, telling him that he was going to "whup" him. At that point, the victim helped his wife gather their children into the house and then telephoned the sheriff's department to report the incident.

The victim testified that the defendant's dog had attacked his family in the past and described the incident that occurred as he and his family were walking home past the defendant's yard. He also described the incident where the dog had chased the little girl on the bicycle. On cross-examination, he acknowledged that the defendant never let the dog off its leash during the April 17, 2005, incident. He testified that the defendant had the dog pointed toward him and was looking directly at him when he told the dog to "sic" him and that he was no more than twenty-five feet from him at the time. The victim acknowledged that he had had "run-ins" with the defendant in the past and that he and his neighbors had held a party to celebrate when the defendant previously had moved from the neighborhood.

The defendant's wife, Melinda Nunnery, testified that she, the defendant, and her seven-year-old son had been planning to take the defendant's dog for a walk together on the afternoon of April 17, 2005, but she had changed her mind at the last minute. She said she was on the porch of the defendant's house when she heard the defendant say, "Come on, Dusty," as he and his leashed dog turned left at the end of their driveway. She stated that the defendant never let the dog off its leash and that she never heard the defendant or the victim speak to each other. On cross-examination, she acknowledged that pit bulls have a reputation as an aggressive breed and that she and the defendant had "Beware of Dog" signs posted around their yard. She explained, however, that they had placed the signs to protect their property, not because the dog was aggressive.

The defendant testified that he and his stepson were taking his dog for a walk on the afternoon of April 17, 2005, at the same time that the victim was outside in his yard with his wife, son, and dog. He said that his dog saw the victim's dog and "wanted to go over there to it," so he pulled left on the dog's leash and said, "Come on, Dusty" as he continued to walk down the street. He stated that he was at the end of his driveway, approximately twenty-five to thirty feet from the victim, when he told his dog to come on. He denied that he walked into the middle of the street, said anything to the victim, or intended to threaten the victim in any way. On cross-examination, he acknowledged that the pit bull breed has a reputation for aggressive behavior and that his dog had gotten loose from his yard on several occasions.

## ANALYSIS

The sole issue the defendant raises on appeal is whether the evidence was sufficient to sustain his conviction. Specifically, he contends that there was insufficient proof that the victim reasonably

feared imminent bodily injury from the pit bull. In support, he cites the undisputed proof that he never turned the dog loose and the victim's testimony that he was twenty-five feet away when the alleged altercation took place. The defendant additionally asserts that the victim's actions in "rolling his head" and walking away were not those of a person who feared imminent bodily harm. The State argues that the proof was sufficient to show that the victim reasonably feared imminent bodily injury from the dog. We agree with the State.

In considering this issue, we apply the familiar rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The findings of the trial judge in a bench trial carry the same weight as a jury verdict. State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999).

To convict the defendant of assault, the State had to prove beyond a reasonable doubt that the defendant intentionally or knowingly caused the victim to reasonably fear imminent bodily injury. Tenn. Code Ann. § 39-13-101(a)(2) (2003 & 2006). Viewed in the light most favorable to the State, the evidence established that the defendant threatened, both by words and by gesture, to turn his pit bulldog loose on the victim and his family. The evidence further established that this dog was known by the victim and other neighbors for its aggressive tendencies and that it was straining and snarling at the end of its taut leash at the time of the incident. In addition, as the trial court noted in its findings, the dog was of a breed that has a general reputation for aggression:

Of course a finding of guilt of assault requires a finding that the Defendant by either words or actions places another person in reasonable fear of imminent bodily injury by one who has the present ability to do that, to inflict bodily injury. And of course having a pit bulldog on a leash or having one out there with you at all makes it even more threatening. And as the testimony indicated, a pit bulldog is a dangerous dog.

. . . .

Now, if the dog he was going to let go had been a poodle or a Chihuahua, that of course wouldn't have been much of a threat. But with a pit bull it's clear that the statement that you're going to let a pit bulldog go would be a statement that would place a person in reasonable fear of imminent bodily injury. And the person with the dog as a weapon would have a clear ability to do that.

We conclude, therefore, that the evidence was sufficient for a rational trier of fact to find that, by threatening to set his pit bulldog loose on the victim, the defendant intentionally or knowingly caused the victim to reasonably fear imminent bodily injury.

## CONCLUSION

Following our review, we conclude that the evidence is more than sufficient to sustain the defendant's assault conviction. Accordingly, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE